## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES PITRMAN, | ) | CASE NO. 1:22-CV-00711-JPC |
| Plaintiff, | ) | |
| | ) | JUDGE J. PHILIP CALABRESE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant, | ) | |
| | ) | |

### I.        INTRODUCTION

Plaintiff Charles Pitrman ("Mr. Pitrman") seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order No. 2022-14. For the reasons set for the below, I RECOMMEND that the Court AFFIRM the final decision of the Commissioner.

### II.       PROCEDURAL HISTORY

On October 29, 2019, Mr. Pitrman filed applications for DIB and SSI, alleging a disability onset date of January 22, 2009. (Tr. 211-13, 218-27).[1] He amended his alleged disability onset date

---

[1] The transcript referred to in this Report and Recommendation can be located at ECF Doc. 7 on CM/ECF.

to June 14, 2017. (Tr. 235). His application was denied initially on January 24, 2020, and upon reconsideration on October 9, 2020, and Mr. Pitrman requested a hearing before an administrative law judge ("ALJ"). (Tr. 15, 134-35). On May 27, 2021, an ALJ held a hearing, during which Mr. Pitrman, represented by counsel, and an impartial vocational expert testified. (Tr. 44-75). On June 2, 2021, the ALJ issued a written decision finding Mr. Pitrman was not disabled. (Tr. 15-33). The ALJ's decision became final on April 1, 2022, when the Appeals Council declined further review. (Tr. 1-3). Mr. Pitrman asserts the following assignments of error in his merits brief:

1. Whether the Administrative Law Judge's decision is supported by substantial evidence, where the ALJ failed to include pertinent restrictions contained in the medical opinions, without any explanation for the omission of those restrictions

2. Whether the Administrative Law Judge's decision is supported by substantial evidence, where the ALJ misstates the record as to Plaintiff's daily activities, and then uses those activities to find that Plaintiff's allegations of disability were not credible

3. Whether the Administrative Law Judge erred in evaluating Plaintiff's compliance with recommended medical treatment without following the dictates of Social Security Rulings SSR 18-3p

(ECF Doc. 12, PageID#1196).

## III.    BACKGROUND INFORMATION

### A.  *Personal, Educational, and Vocational Experience*

Mr. Pitrman was born in 1970, and he was 47 years old on the alleged onset date. (Tr. 32). He lives with his ex-wife, who is on disability due to anxiety and inability to leave their home. (Tr. 46-47). At the time of the hearing, Mr. Pitrman testified that he had a driver's license with no restrictions. (*Id.*). He has an eighth-grade education and did not obtain a GED or receive any other specialized vocational training. (Tr. 45-46). He previously worked as a drywall installer, dump truck driver, and landscape laborer. (Tr. 71).

2

**B.  *Relevant Hearing Testimony***

**1.Mr. Pitrman's Testimony**

Mr. Pitrman testified that he was unable to work due to back and leg pain that he described as "killing [him]." (Tr. 55). Additionally, he testified that he experiences shortness of breath, even while taking out the trash. (*Id.*). He described having no energy (Tr. 55) and daily chest pain (Tr. 56).

Mr. Pitrman stated that he has experienced back pain since undergoing a triple cardiac bypass. (Tr. 57). Although his doctors attribute this pain to arthritis, he states that it resulted from his heart surgery. (*Id.*). He was prescribed Gabapentin for his back pain, but he did not find it helpful. (*Id.*). He also took Tylenol for pain. (*Id.*).

Mr. Pitrman testified that his leg pain occurred in the area where the doctor removed arteries during his bypass operation. (*Id.*). He reported that his physicians instructed him to walk for exercise. (Tr. 58-59). He walks around the block at least every day in the afternoon. (Tr. 59). He states that it would take a normal person about 25 minutes to walk a block, but it takes him at least one hour and 10 minutes to one hour and 20 minutes. (Tr. 59-60). While he also rides a bike as a form of exercise two to three times a week, he asserted that this causes leg pain. (Tr. 60).

Mr. Pitrman stated that the only chore he does at the house is take out the garbage. (*Id.*). He testified that his ex-wife does the grocery shopping and cooks and prepares meals. (Tr. 60-61). He is unable to do the laundry because his washer and dryer is downstairs, and he cannot climb stairs because he needs to sit after taking four or five steps. (*Id.*). His neighbor cuts his lawn because it is "impossible" for him to do so. (Tr. 62).

Mr. Pitrman described his typical day to the ALJ. (Tr. 62-64). In the morning, he wakes up, makes a cup of coffee, takes his medicine, watches the news, and sits on the front porch. (Tr.

62). He sits outside or in the house all day. (*Id.*). In the afternoon, he testified that he tries to take

a walk around the block or ride a bike. (*Id.*). He does not go to gyms due to concerns over COVID-

19. (Tr. 62-63). He testified that he has no hobbies. (Tr. 62). He tried woodworking, but his hand

pain made it too painful for him to continue. (*Id.*). He testified that his hands would hurt all day.

(Tr. 64).

He estimated that he was able to walk for five to ten minutes before needing to rest due to

pain in his left leg. (Tr. 64-65). He also stated that he experienced shortness of breath when he

walks and would need to sit down. (Tr. 65). He further stated that lifting a basket of laundry would

also cause shortness of breath. (*Id.*). He estimated that he could comfortably lift about four to five

pounds. (Tr. 66). He also stated that it was difficult bringing groceries in from the car after his wife

completed grocery shopping because he would have to take five to ten minute rest breaks in

between carrying in the bags. (*Id.*). He further reported dizziness while changing positions. (Tr.

68).

### 2.<u>Vocational Expert's Testimony</u>

The vocational expert ("VE") testified that Mr. Pitrman's past relevant work was as a

drywall installer (*Dictionary of Occupational Titles* ("DOT") # 842.361-030), landscape laborer

(DOT# 408.687), and dump truck driver (DOT# 902.683-010). (Tr. 71-2). The ALJ asked the VE

to consider a person with Mr. Pitrman's age, education, and vocational background who would be

limited to performing work at a light exertional level, with additional limitations of only

occasionally climbing ramps and stairs, or ladders, ropes, or scaffolds; occasionally stooping or

crawling; and with no more than frequent exposure to extreme heat or cold. (Tr. 72). The VE

opined that the individual could not perform Mr. Pitrman's past relevant work, but he could

perform other work as a cashier (DOT#211.462.010), retail maker (DOT# 209.587-034), and assembler (DOT# 706.684-022). (Tr. 73).

As a second hypothetical, the ALJ asked the VE whether a person with Mr. Pitrman's age, education, and vocational background at the sedentary level could perform other work if he had Mr. Pitrman's RFC, but was also limited to sedentary work and could never climb ladders, ropes, or scaffolds. (*Id.*). The VE testified that this individual could perform the following sedentary jobs: (1) document preparer (DOT# 249.587-018); (2) inspector (DOT #669.687-014); and (3) sorter (DOT# 521.687-086). (Tr. 74). She indicated that Mr. Pitrman's past relevant work would not provide any transferable skills to lighter-level employment. (Tr. 73-74).

Finally, Mr. Pitrman's counsel asked the VE whether an individual who would miss two or more days per month or who would be "off task" for 20% or more of a workday would be able to maintain employment. (Tr. 75). The VE opined that that these limitations would be work-preclusive, and there would be no jobs available for this individual. (*Id.*).

### C. *Relevant Medical/Non-Medical Opinion Evidence*

#### 1. <u>State Agency Medical Consultants</u>

##### a. Anton Freihofner, M.D.

Dr. Freihofner reviewed Mr. Pitrman's medical records on January 22, 2020. (Tr. 91-92). He opined that Mr. Pitrman could perform light work; never climb ladders, ropes, or scaffolds; never crawl; and must avoid concentrated exposure to extreme heat or cold. (Tr. 92).

##### b. James Cachillo, M.D.

On October 9, 2020, Dr. Cachillo reviewed Mr. Pitrman's medical records. (Tr. 100-01). Like Dr. Freihofner, Dr. Cachillo opined that Mr. Pitrman could perform light work; occasionally

climb ramps, stairs, ladders, ropes, or scaffolds; occasionally stoop and crawl; and should avoid concentrated exposure to extreme heat or cold. (Tr. 101).

### 2. Dariush Saghafi, M.D.

On August 20, 2020, Dr. Saghafi conducted a consultative examination on Mr. Pitrman. (Tr. 1019-21). During this examination, Mr. Pitrman was noted to have a robust build, with symmetric and full strength in all muscle groups. (Tr. 1020-21). He also had normal reflexes and normal gait. (Tr. 1021). Dr. Saghafi wrote that Mr. Pitrman was "incapable of performing anything but the mildest amount of physical labor, however, does work his tools in his garage to repair his lawn mower and also keep himself occupied." (*Id.*). Dr. Saghafi indicated that Mr. Pitrman is capable of lifting a 5 gallon pail of paint and carrying it 15 feet, but he does not paint or climb ladders. (*Id.*). Dr. Saghafi opined that Mr. Pitrman is able to sufficiently lift, push, and pull to perform his activities of daily living and lift 45 to 50 pounds. (*Id.*). Dr. Saghafi also opined that Mr. Pitrman was able to bend, walk, and stand up to "200m." (*Id.*). Dr. Saghafi further opined that Mr. Pitrman was able to understand the environment as well as his peers, communicate satisfactorily, and travel independently. (*Id.*).

### 3. Mohammed Nasser, M.D.

Dr. Nasser provided two medical opinions regarding Mr. Pitrman on September 15, 2020, and December 15, 2020. On September 15, 2020, Dr. Nasser opined that Mr. Pitrman could lift 10 to 20 pounds occasionally, owing to the fact that Mr. Pitrman had an ejection fraction of 35%. (Tr. 1094). Dr. Nasser found that Mr. Pitrman's walking, stand, and sitting were not affected by the impairment. (*Id.*). Dr. Nasser opined that Mr. Pitrman could rarely climb, but he could occasionally balance, stoop, crouch, kneel, and crawl. (*Id.*). Dr. Nasser further opined that Mr. Pitrman should rarely reach, push, or pull, but he could frequently perform fine and gross manipulation. (Tr. 1095).

Regarding environmental limitations, Dr. Nasser opined that Mr. Pitrman should avoid moving machinery, but he did not need to avoid heights, temperature extremes, pulmonary irritants, or noise. (*Id.*). Dr. Nasser also indicated that Mr. Pitrman did not have pain and could elevate his legs. (Tr. 1095). Finally, Dr. Nasser opined that Mr. Pitrman requires unscheduled rest periods during an eight-hour workday outside the standard breaks. (*Id.*).

On December 15, 2020, Dr. Nasser completed a medical source statement form. (Tr. 1135-36). He opined that Mr. Pitrman could lift a maximum of five pounds due to his coronary artery disease and his ischemic cardiomyopathy. (Tr. 1135). Dr. Nasser indicated that Mr. Pitrman's standing and walking were affected by his impairment, but he did not specify the amount of time Mr. Pitrman could stand or walk. (*Id.*). Dr. Nasser opined that Mr. Pitrman's sitting was not affected by his impairment. (*Id.*). Dr. Nasser limited Mr. Pitrman to occasional postural movements. (Tr. 1136). Regarding the use of Mr. Pitrman's upper extremities, Dr. Nasser stated that Mr. Pitrman could rarely push or pull, but he could frequently reach or perform manipulation. (*Id.*). Dr. Nasser also opined that Mr. Pitrman has moderate pain that would interfere with Mr. Pitrman's concentration, take him off task, and cause absenteeism. (*Id.*). Finally, Dr. Nasser indicated that Mr. Pitrman would require additional unscheduled rest periods during an eight-hour day, but he did not specify the duration of those rest periods. (*Id.*).

### D.  *Relevant Medical Evidence*

The ALJ summarized Mr. Pitrman's health records and symptoms as follows:

> The record indicates a significant cardiovascular history, as the claimant underwent DES to the mid left anterior descending (LAD) on March 29, 2013 (See Exhibit 1F/4). The RCA was occluded, appropriately 30%; however, the claimant's left ventricular ejection fraction was normal, at 65% (*Id.*).
>
> On April 21, 2014, the claimant underwent percutaneous coronary angioplasty (See Exhibit 1F/4).

On March 4, 2018, the claimant sought emergency treatment at MetroHealth Medical Center for chest pain radiating to the left arm and back, similar to a prior myocardial infarction (MI) (Exhibit 1F/99-133). Examination revealed a blood pressure level of 150/111, and was otherwise normal (*Id.*). An EKG showed significant ST depressions that were dynamic on repeat EKG, and laboratory testing revealed elevated troponins consistent with non-ST segment elevation myocardial infarction (NSTEMI) (*Id.*). The claimant was admitted to the CICU for NSTEMI and unstable angina (*Id.*). A chest x-ray conducted that day revealed borderline heart size and bibasilar atelectasis and/or infiltrate (Exhibit 1F/112). An echocardiogram revealed focally abnormal left ventricular (LV) systolic function-akinesia of mid anterior free wall, basal and mid anteriorlateral, basal inferlateral, entire inferior, LV ejection fraction (EF) of 40%, normal right ventricular systolic function, concentric left ventricular hypertrophy, fibrocalcific changes in the aortic valve., and dilated sinus of Valsalva (Exhibit 1F/124). On March 5, 2018, the claimant underwent PCI (coronary angioplasty with stent, balloon angioplasty) with DES placement to the LCx and PTCA only of OM2 (Exhibit 1F/114). The claimant was started on medications and remained chest pain free throughout hospitalization (Exhibit 1F/99-133). He was discharged on March 6, 2018 in improved condition, with restrictions consisting of no heavy lifting and no strenuous activity (*Id.*). The claimant was instructed to follow up with his primary care provider in two weeks, and cardiology in one month (*Id.*).

On April 17, 2018, the claimant underwent follow up with Lisa O'Brien, APRN-CNP, of MetroHealth Medical Center, Cardiology Department (Exhibit 1F/91-95). The claimant reported feeling really good, with much more energy since the procedure (*Id.*). The claimant specifically denied chest pain, shortness of breath, palpitations, PND/orthopnea, edema, weight gain, or complications at the right artery site (*Id.*). The claimant indicated he was able to walk much more, and does not get out of breath anymore, and he was not interested in cardiac rehabilitation (*Id.*). Examination was normal, with a well-healed right radial artery site (*Id.*). Ms. O'Brien assessed the claimant with coronary artery disease (CAD), status post PTCA and coronary artery stent placement, hypertension, hyperlipidemia, and tobacco abuse, and noted the claimant appears stable from a cardiac standpoint (*Id.*). She instructed the claimant to continue current medications, quit smoking, and follow up with Dr. Rovner for a routine visit (*Id.*).

MetroHealth telephone records indicate the claimant was completely out of medications on June 12, 2018 (Exhibit 1F/91).

On August 15, 2018, the claimant underwent follow up with cardiologist Aleksandr Rovner, M.D., at which time the claimant denied chest pain or shortness of breath (Exhibit 1F/87-90). The claimant was smoking 2.5 packs per day at the time, which was down from 3.5 packs per day prior to March 2018 (*Id.*). Treatment notes indicate current medications consisting of nitroglycerin .4 mg, aspirin 81 mg, atorvastatin 80 mg, Plavix 75 mg, lisinopril 10 mg, metoprolol 50 mg, nicotine patches, and Protonix 40 mg (*Id.*). Examination was unremarkable, revealing a

blood pressure level of 120/74, pulse oxygen saturation level of 97% on room air, body mass index (BMI) of 24, no acute distress, and normal skin, neck, lungs, heart, pulses, extremities, and neurological findings (*Id*.). Dr. Rovner diagnosed the claimant with CAD, status post NSTEMI, status post DEX to Cx in March 2018, hyperlipidemia, and tobacco use disorder, and increased lisinopril to 20 mg (Id.). Dr. Rovner instructed the claimant to continue his remaining medications, quit smoking, and follow up in six months (*Id*.). He also ordered a limited echocardiogram (*Id*.).

A transthoracic echocardiogram conducted on September 13, 2018 revealed normal left ventricle systolic function, with an ejection fraction of 60% (Exhibit 1F/85-86).

On April 4, 2019, the claimant complained to primary care provider Emily Ferrall, APRN-CNP, of MetroHealth Medical Center, West Park Health Center, of chest pain radiating to the shoulders, relieved with rest, and worse with emotional stress (Exhibit 1F/83-85). The claimant also reported cough and dyspnea, but denied lightheadedness, nausea, vomiting, shortness of breath, or wheezing (*Id*.). The claimant was still smoking (*Id*.). Examination was unremarkable, revealing a normal blood pressure level, heart, lungs, abdomen, and neurological findings (*Id*.). Ms. Ferrall diagnosed the claimant with coronary artery disease, status post percutaneous coronary angioplasty, cough, and chest pain, ordered laboratory testing and a cardiology referral, and instructed the claimant to stop smoking (*Id*.).

An ECG conducted on August 14, 2019 revealed no evidence of ischemia, with no abnormal ST segment changes, and no rhythm abnormality (Exhibit 1F/82).

A coronary angiogram conducted on August 28, 2019 revealed severe three-vessel artery disease but normal LVEDP (Exhibit 1F/72, 199).

A vascular carotid procedure conducted the same day was largely unremarkable (Exhibit 1F/67). There was 0-19% stenosis of the right ICA, minimal heterogeneous plaque in the carotid bulb, the external carotid artery was patent without stenosis, and the vertebral artery was patent with antegrade flow (*Id*.). There was also evidence of 0-19% stenosis of the left ICA, minimal heterogeneous plaque in the carotid bulb, the external carotid artery was patent with no stenosis, and the vertebral artery was patent with antegrade flow (*Id*.).

An echocardiogram conducted on September 11, 2019 showed focal superimposed on globally abnormal LV systolic function, with akinetic inferolateral, inferior, and mid anterolateral walls (Exhibit 1F/62). The inferior and inferolateral walls were thinned, which could be from scar or hibernation (*Id*.). Left ventricular ejection fraction was 35%, and the left ventricle was dilated (*Id*.). However, the test showed normal right ventricular systolic function, and no indication of hemodynamically significant valve disease (*Id*.). Pulmonary artery systolic pressure could not be estimated, and noninvasive hemodynamic assessment was consistent with low CVP (*Id*.).

9

Lower extremity plethysmography conducted on September 12, 2019 revealed a right ABI of 1.2, compatible with no peripheral arterial occlusive disease of the right lower extremity, and left ABI of 1.1, compatible with no peripheral arterial occlusive disease of the left lower extremity (Exhibit 1F/58-59).

A chest CT performed on September 13, 2019 revealed findings compatible with mild respiratory bronchiolitis, but no focal consolidation, pleural effusion, or pneumothorax (Exhibit 1F/182-184).

On October 2, 2019, the claimant complained to Nicole Perez, PA-C, of MetroHealth Medical Center, Cardiology Department, of chest pain/pressure with heavy lifting, which he was currently avoiding, and shortness of breath triggered by climbing stairs (Exhibit 2F/23-27). The claimant was still smoking, but had cut back from 3/4 pack per day from 2-3 packs per day since age 10 to 11 (*Id.*). The claimant was no longer drinking, and had been previously drinking a sixpack of beer per day (*Id.*). Examination was unremarkable, revealing a normal blood pressure level, a BMI of 28, a pulse oxygen saturation level of 99%, no acute distress, normal heart, lungs, and abdomen, normal extremities, with normal pulses, no edema, cyanosis, or clubbing, and no lower extremity varicosities, and normal neurological findings, as the claimant was alert and oriented, with an appropriate gait, and intact upper and lower extremity strength (*Id.*). Ms. Perez noted triple vessel CABG scheduled for October 10, and instructed the claimant to stop Plavix on October 4 (*Id.*). She discussed the claimant's post-operative course and noted he would need outpatient pulmonary follow up for respiratory bronchiolitis at discharge (*Id.*).

On October 10, 2019, the claimant presented at MetroHealth Medical Center for coronary artery bypass grafting, given a history of multi-vessel CAD with prior multiple PCIs, and LHC intervention which revealed severe coronary artery disease warranting surgical intervention (Exhibit 1F/7-55; 2F/37-377). On October 10, 2019, the claimant underwent coronary artery bypass grafting x 3 with left internal mammary artery to the left anterior descending (LAD), saphenous vein graft to PDA, and saphenous vein graft to OM 2 (*Id.*). The claimant was discharged in stable condition on October 15, 2019 (*Id.*).

On October 22, 2019, the claimant complained to Ms. Perez of increased left swelling and pain, intermittent left infrascapular pain, sleep problems, and daytime fatigue (Exhibit 1F/6; 2F/378-379). The claimant had not been elevating his legs (*Id.*). Examination revealed fine crackles at the left lung base, 2+ pretibial edema on the left, and 1+ pretibial edema on the right, but normal heart, otherwise normal lungs, clear to auscultation bilaterally, and normal abdomen (*Id.*). A chest x-ray showed interval improvement to the bibasilar subsegmental atelectasis and a small left pleural effusion (Exhibit 1F/149; 9F/48). Ms. Perez assessed the claimant with past medical history of CAD, status post CABC x 3, provided compression stockings, and instructed the claimant to elevate his legs when seated (Exhibit 1F/6;

2F/378-379). Ms. Perez advised the claimant to follow a low sodium and saturated fat diet and increase ambulatory activity as tolerated (*Id*.). She continued the claimant's current post-operative instructions of no heavy lifting greater than 10 pounds, pushing, or pulling for 6 weeks after surgery, and ordered follow up with the claimant's primary care provider (*Id*.).

The claimant underwent follow up with Ms. Ferrall on November 14, 2019, at which time he reported doing well since the CABG, with no chest pain or leg pain (Exhibit 1F/3-5; 3F/9-11; 2F/383-386). The claimant reported some muscle aches, improved with use of Tylenol (*Id*.). Examination was unremarkable, revealing a normal blood pressure level, normal heart, lungs, and abdomen, no edema, tenderness, or musculoskeletal deformities, no back tenderness, and normal neurological findings, as the claimant was alert and oriented, with normal motor and sensory function (*Id*.). Ms. Ferrall diagnosed the claimant with CAD, status post CABG, stable, and ordered follow up with cardiology (*Id*.). The claimant declined cardiac rehabilitation at the time (*Id*.).

On December 23, 2019, the claimant underwent evaluation with cardiologist Ashish Aneja, M.D., of MetroHealth Medical Center (Exhibit 3F/4-8; 2F/391-399). The claimant reported improved functional status since surgery, and specifically denied shortness of breath, chest pain, or fatigue with exertion (*Id*.). The claimant's current medication regimen consisted of aspirin 162 mg, metoprolol 50 mg, lisinopril 20 mg, and atorvastatin 80 mg (*Id*.). Examination was unremarkable, revealing a blood pressure level of 118/84, pulse oxygen saturation level of 98%, BMI of 29, normal alertness and orientation, no acute distress, normal skin, eyes, and neck, clear lungs to auscultation, normal cardiovascular findings, including regular rate and rhythm, without murmurs, rubs, or gallops, and normal pulses (*Id*.). Dr. Aneja diagnosed the claimant with CAD, status post CABD, ischemic cardiomyopathy (CMO), hypertension, hyperlipidemia, and lower extremity pain, prescribed ezetimibe 10 mg and varenicline .5 mg, and increased metoprolol to 100 mg (*Id*.). Dr. Aneja counseled the claimant on smoking cessation, ordered a repeat echocardiogram prior to the next visit, and instructed the claimant to follow up with cardiac rehabilitation (*Id*.).

On June 1, 2020, the claimant underwent a telehealth visit with cardiologist Meera Kondapaneini, M.D., of MetroHealth Medical Center, complaining of shortness of breath with minimal exertion associated with left arm pain/chest pain (Exhibit 5F/5-10). The claimant indicated the symptoms resolve with rest, and he indicated no improvement with use of nitroglycerin (*Id*.). No examination was conducted, given the nature of the visit (*Id*.). Dr. Kondapaneini diagnosed the claimant with chest pain/shortness of breath, ischemic CMO, hypertension, controlled on medications, hyperlipidemia, uncontrolled, and lower extremity pain, prescribed Imdur 30 mg, and instructed the claimant to continue metoprolol 100 mg, lisinopril 20 mg, atorvastatin, and ezetimibe (*Id*.). Dr. Kondapaneini ordered a nuclear stress test and noted the claimant still had not undergone cardiac rehabilitation (*Id*.).

11

The claimant underwent stress testing on July 27, 2020, which revealed typical stress induced angina-like discomfort (Exhibit 6F/5-8; 9F/25-34). The claimant did not achieve target heart rate, as the test had to be stopped early to due chest pain, suggestive of ischemia (*Id.*). An ECG was notable for abnormal ST segment changes that began at two minutes into exercise, consisting of mild ST depression (*Id.*). PACs were notable during the first minute into recovery only (*Id.*).

On August 5, 2020, the claimant underwent telehealth follow up with Dr. Kondapaneini, complaining of typical chest pain even with taking out the garbage (Exhibit 9F/17-24). However, the claimant was still smoking a pack of cigarettes per day (*Id.*). Dr. Kondapaneini assessed the claimant with chest pain/shortness of breath, ischemic CMO, CAD status post CABG, hypertension, controlled on medications, hyperlipidemia, and lower extremity pain, and increased Imdur to 60 mg daily (*Id.*). Dr. Kondapaneini ordered the claimant to undergo catheterization Friday and follow up in six weeks (*Id.*).

On August 10, 2020, the claimant underwent elective left heart catheterization (LHC) given the recent positive stress ECG with typical angina symptoms and ST changes (Exhibit 7F; 9F/2-16). Cardiac catheterization revealed angio findings of diffuse native vessel disease, patent LIMA to LAD, unable to assess SVG to OM, LCx filling retrogradely without any discernible OM graft, ostial stenosis SVG to PDA of 80 to 90%, extremely fibrotic, and improvement in flow post PTCA (Exhibit 7F/5). The claimant remained asymptomatic and cardiac markers remained negative on laboratory testing (Exhibit 7F; 9F/2-16). The claimant was able to ambulate on flat surfaces and up three flights of stairs without difficulty or chest pain (*Id.*). He was discharged on August 11, 2020 in stable conditions with prescriptions for Brilinta 90 mg, Lipitor 80 mg, aspirin 81 mg, Imdur 60 mg, lisinopril 20 mg, gabapentin 100 mg, Zetia 10 mg, metoprolol 100 mg, Protonix 40 mg, and acetaminophen 325 mg (*Id.*). The claimant was instructed to undergo cardiac rehabilitation and follow up with cardiology (*Id.*).

On August 20, 2020, the claimant underwent consultative examination with Dariush Saghafi, M.D., complaining of chest pain, shortness of breath, exertional dyspnea, back pain, and leg pain (Exhibit 8F). The claimant said he can barely take the garbage out, but had dirt under his fingernails, which he attributed to having been working on his lawn mower (*Id.*). The claimant admitted he is able to do laundry and dishes, and was still smoking a half pack of cigarettes per day (*Id.*). Examination revealed a height of 71" and weight of 212 pounds, and mildly elevated blood pressure level of 138/84 (*Id.*). However, Dr. Saghafi noted a robust build with symmetric strength in the arms and legs (*Id.*). The claimant was instructed to walk quickly up to 200' in the office, and during the recovery phase, there was no evidence of respiratory distress, nasal flaring, pallor of the mucosal surfaces of the mouth or conjunctive, and no arrhythmias (*Id.*). The claimant's heart rate was appropriately elevated and returned to baseline in less than 2 minutes (*Id.*). Examination revealed normal heart, lungs, abdomen, and pulses, full upper and lower extremity strength, and intact sensation (*Id.*). The claimant deferred lumbar

spine range of motion due to complaints of dizziness; however, examination revealed full range of motion of the cervical spine and upper and lower extremities (*Id*.). There was no evidence of percussion tenderness over the cervical spine through the lumbar vertebral bodies, and examination confirmed normal deep tendon reflexes and gait (*Id*.). In terms of an impression, Dr. Saghafi noted the claimant was status post myocardial infarction (MI) x two with two stents, a recent balloon angioplasty, and CABG x 3 which the claimant states is failing (*Id*.). Dr. Saghafi opined the claimant is able to lift, push, and pull sufficiently to be able to perform activities of daily living and lift 45-50 pounds, is able to bend, walk, and stand up to 200 m, is able to understand the environment as well as peers and communicate satisfactorily, and is able to travel independently (*Id*.).

An x-ray of the lumbar spine conducted on October 6, 2020 revealed mild S-shaved curvature of T spine with rotary component, a transitional L5 vertebral body, moderate degenerative changes and intervertebral disc space narrowing involving the L4-5 and L5-S1 levels, and mild to moderate intervertebral disc space narrowing involving upper levels of the lumbar spine, but no fracture or subluxation (Exhibit 12F).

On September 3, 2020, the claimant underwent follow up with cardiologist Aisha Siraj, M.D., at which time he reported doing well, with improved ET (Exhibit 10F/59-64; 11F/15-19). Dr. Siraj assessed the claimant with coronary artery disease involving native heart, angina presence unspecified, unspecified vessel or lesion type, and instructed the claimant to continue aspirin, Brelinta, metoprolol, Lisinopril, and Imdur, and switch to Plavix 75 mg with appropriate loading does after a month (*Id*.). Dr. Siraj discussed lifestyle modifications and ordered follow up in six months (*Id*.).

On September 15, 2020, the claimant began treatment with cardiologist Mohamed Nasser, M.D., of MetroHealth Medical Center, complaining of shortness of breath (Exhibit 10F/51-58; 11F/2- 11). However, the claimant denied chest pain, lower extremity swelling, PND, or orthopnea (*Id*.). Dr. Nasser noted the claimant switched to Plavix but did so without the loading dose (*Id*.). Examination revealed mild obesity, as the claimant measured 5'11" and weighed 223 pounds, rendering a BMI of 31 (*Id*.). However, examination was otherwise unremarkable, revealing a normal blood pressure level, no acute distress, and normal heart, lungs, abdomen, extremities, neurological findings, and pulses (*Id*.). Dr. Nasser affirmed diagnoses of ischemic CMO, CAD status post CABG, hypertension, controlled on medications, hyperlipidemia, uncontrolled, and leg pain, and increased metoprolol to 150 mg (*Id*.). He instructed the claimant to continue Lisinopril, atorvastatin, and ezetimibe at the same dosages, and to continue DAPT with aspirin and Plavix at least until August 2021 (*Id*.). Dr. Nasser counseled the claimant on smoking cessation and ordered an echocardiogram (*Id*.). He noted the claimant had not undergone cardiac rehabilitation (*Id*.)

The claimant returned to Dr. Nasser on December 15, 2020, reporting improved chest pain with the metoprolol dosage increase (Exhibit 14F). The claimant indicated only two episodes of chest pain, which he treated with sublingual nitroglycerin (*Id*.). Dr. Nasser noted general deconditioning, as the claimant reported muscular pain in the extremities whenever he lifts more than five pounds, which was different from his prior chest pain (*Id*.). Dr. Nasser also indicated back pain since the time of surgery (*Id*.). Examination revealed a height of 5'11" and weight of 229 pounds, rendering a BMI of 32, but normal blood pressure level, 96% pulse oxygen saturation level on room air, normal appearance, no acute distress, normal heart, lungs, and abdomen, normal extremities, without deformity or edema, normal neurological findings, and normal pulses (*Id*.). Dr. Nasser assessed the claimant with CAD, status post CABG, and now status post PTCA of ostitial SVG to PDA, ischemic CMO, hypertension, controlled on medications, and hyperlipidemia, controlled on medications, and increased Imdur to 120 mg QD (*Id*.). He instructed the claimant to continue DAPT with aspirin and Plavix until August 2021, after which single antiplatelet therapy could be continued (*Id*.). Dr. Nasser specifically instructed the claimant to continue metoprolol 150 mg, Lisinopril 20 mg, atorvastatin 80 mg, and Zetia 10 mg at unchanged doses (*Id*.). He also referred the claimant to cardiac rehabilitation, as the claimant had never completed it after surgery (*Id*.).

(Tr. 21-27).

## IV. THE ALJ'S DECISION

In her June 2, 2021 decision, the ALJ made the following findings:[2]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since June 14, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: chronic ischemic heart disease, with or without angina; coronary artery disease; lumbar degenerative disc disease; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[2] The ALJ's findings are summarized.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except occasionally climb ramps and stairs, as well as ladders, ropes, and scaffolds; occasionally stoop and crawl; frequently be exposed to extreme heat and extreme cold.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born [in 1970] and was 47 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 14, 2017, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-33).

## V.    LAW AND ANALYSIS

### A.  *Standard of Review*

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.  *Standard for Disability***

16

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  *Persuasiveness of Opinions (Step Four)*

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[3] According to the

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

### D.  *SSR 16-3p – Subjective Symptoms Evaluation*

In determining whether a claimant is disabled, the ALJ considers all of the claimant's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective evidence in the record. SSR 16-3P, 2017 WL 5180304, at *2. The ALJ is required to use a two step-process. *Id*. at *3. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. *Id.* Second, the ALJ evaluates the intensity, persistence, and limiting effects of a claimant's symptoms. *Id.* at *4. In so doing, the ALJ should consider the evidence provided and, when relevant, seven factors listed in SSR 16-3p. The factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or symptoms; (5) treatment other than medication for the relief of pain or symptoms; (6) any other measures used to relieve pain or symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain and other symptoms. Id. at *7–8. The ALJ need not discuss all seven factors but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

A claimant's subjective complaints "can support a claim for disability[ ] if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). An ALJ, however, "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, [the ALJ] will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304, at *8.

The ALJ's determination of credibility is given "great weight" because he, unlike the Court, has the opportunity to observe the claimant's demeanor while testifying. *Jones*, 336 F.3d at 476 (citations omitted). However, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so.").

### E.  *Selectively Parsing the Record ("Cherry Picking")*

The regulations compel ALJs to "consider all evidence available in [an] individual's case record." 42 U.S.C. § 423(d)(5)(B). However,

> an ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability. Courts have not hesitated to remand under such circumstances. *See, e.g., Gentry* [*v. Comm'r of Soc. Sec.*, 741 F.3d 708,

724 (6th Cir. 2014)] (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson* [*v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008)] (finding error where the ALJ was "selective in parsing the various medical reports"); *see also Williams v. Colvin*, 2017 WL 1319781 at * 16 (N.D Ohio Feb. 1, 2017), *report and recommendation adopted by*, 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015), *report and recommendation adopted by*, 2015 WL 2142396 (S.D. Ohio May 6, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light.") ... *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherrypicking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.["]).

*Davidson v. Berryhill*, No. 16-cv-2621, 2017 WL 4682343, at *17 (N.D. Ohio Oct. 18, 2017).

At the same time, "it is well settled that ...an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, so long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *accord Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Notably, there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (endorsing the Third Circuit's analysis in *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00–1995 (3d Cir. Dec. 19, 2000) ("[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."). Further, "'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Daniels v. Comm'r of Soc. Sec.*, 152 F.

App'x 485, 489 (6th Cir. 2005) (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)).

Similarly, the Sixth Circuit has recognized that cherry-picking arguments can "cut[] both ways," as they may turn on whether the ALJ's decision falls within his "zone of choice" under substantial evidence review. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009). Indeed, what plaintiff-appellants have called cherry-picking "can [at times] be described more neutrally as weighing the evidence," and the claimant bears the burden of persuading the court "that the ALJ erred in conducting this difficult task." *Id.* at 284.

### F.  *Mr. Pitrman's First Assignment of Error*

Mr. Pitrman's first assignment of error asserts that the ALJ's decision is not supported by substantial evidence because the ALJ failed to include restrictions contained in the medical opinions and failed to explain why these restrictions were omitted. (ECF Doc. 12, PageID#12, PageID#1206). Mr. Pitrman raises two sub-claims with respect to this issue: (1) the ALJ erred by failing to adopt the state agency findings that he should avoid concentrated exposure to extreme heat or cold; and (2) the ALJ erred by not incorporating Dr. Saghafi's opinion regarding Mr. Pitrman's mobility limitations in the ALJ's RFC assessment. (*See id.* at PageID#1206-10). For the reasons set forth below, both of the sub-claims lack merit.

#### 1. The ALJ Did Not Err by Not Including the Limitation of Avoiding Concentrated Exposure to Extreme Heat or Cold in Her RFC Assessment

First, Mr. Pitrman argues that the ALJ's RFC was incomplete because it did not include the environmental limitations (*i.e.*, avoiding exposure to extreme heat or cold) suggested by the prior administrative medical findings, nor the mobility limitations suggested by Dr. Saghafi. (ECF Doc. 12, PageID#1206-10). Yet, Mr. Pitrman's argument overlooks the requirements of the Social

Security rules. Specifically, an ALJ is not required to adopt all of the limitations suggested in prior administrative medical findings or medical opinions, even if the ALJ has found the prior administrative medical findings or medical findings to be persuasive. *See generally* 20 C.F.R. §§ 404.1520c; 416.920c.

Nor does Mr. Pitrman's reliance on the prior administrative medical findings from Drs. Freihofer and Cacchillo lend further credence to his argument. The crux of Mr. Pitrman's argument is that the state agency consultants both found that he should avoid concentrated exposure to extreme heat or extreme cold. Yet, Mr. Pitrman argues that the ALJ, while finding these opinions persuasive, did not adopt the state agency consultants' limitation verbatim. Instead, Mr. Pitrman asserts that the ALJ crafted a RFC that Mr. Pitrman should avoid more than "frequent" exposure to extreme heat and extreme cold, but this RFC did not include the "concentrated exposure" language from the state agency consultants' findings. Thus, Mr. Pitrman asserts that the ALJ erred by not adopting the medical opinions verbatim or explaining why specific limitations in those medical opinions were rejected.

However, the ALJ—while not a physician—is responsible for assessing a claimant's RFC. *See* 20 C.F.R § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). When assessing a claimant's RFC, an ALJ "***is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding***…[and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding. *Poe*, 342 F. App'x at 157 (emphasis added). Significantly, the Sixth Circuit has recognized that "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations

wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, at *7-8 (N.D. Ohio Dec. 4, 2013) (finding that while the plaintiff was correct that the ALJ did not incorporate a limitation in the RFC, "it does not follow that the ALJ's explanation is, therefore, procedurally inadequate, or that that RFC was not supported by substantial evidence").

Furthermore, an ALJ is not obligated to explain each limitation or restriction adopted or not adopted from a non-examining physician's opinion. *See Smith v. Comm'r of Soc. Sec*, 2013 WL 1150133, at *11 (N.D. Ohio Mar. 19, 2013) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight."), *affirmed* (6th Cir. 13-3578 Jan. 30, 3014) ("While Smith contends otherwise, there is no requirement that an ALJ adopt the entirety of a state expert opinion, even if affording it significant weight, or that the ALJ provide an explanation for why certain limitations proposed by the expert were not incorporated into his residual functional capacity assessment.").

Here, controlling Sixth Circuit precedence establishes that an ALJ is not required to include every limitation included in persuasive prior administrative medical findings. Consequently, although the ALJ found the state agency opinions to be persuasive, the ALJ was not required to adopt these findings with respect to Mr. Pitrman's ability to tolerate extreme heat or extreme cold. *See Hogan v. Comm'r of Soc. Sec.*, No. 1:20-cv-01311, 2021 WL 4477786, at *4 (N.D. Ohio Sept. 30, 2021) ("[T]here is no requirement that, once finding an opinion persuasive, the ALJ must adopt the whole opinion."); *Daniels v. Comm'r of Soc. Sec.*, No. 3:19-cv-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020). Significantly, Mr. Pitrman fails to point to any testimony or other medical evidence indicating his inability to tolerate "frequent exposure" to heat or cold, which was

23

included in the RFC. (*See generally* ECF Doc. 12, PageID# 1207-08). Nor does he demonstrate with any evidence how the ALJ's RFC limitation of no more than frequent exposure to extreme heat or cold was unsupported by substantial evidence.

Finally, Mr. Pitrman's assertion that his exposure to extreme heat or cold would reduce the availability of jobs named by the VE at Step Five is unconvincing. (ECF Doc. 12, PageID#1208 (citing Tr. 33)). As the Commissioner points out, this assertion is belied by the *Dictionary of Occupational Titles* ("DOT"). (ECF Doc. 14, PageID#1239). Indeed, the DOT indicates that extreme heat and extreme cold are "not present" in all three jobs identified at Step Five (*i.e.*, Cashier II, Marker, and Assembler). DOT# 211.462-010, 1991 WL 671840; DOT#209.587-034, 1991 WL 671802; DOT# 706.684-022, 1991 WL 679050. Thus, even if the ALJ had adopted the state agency opinions verbatim, it would have had no impact on the VE's testimony because *none* of these jobs required exposure to heat or cold. Accordingly, I find that this sub-claim lacks merit.

### 2. The ALJ Did Not Err in Failing to Include Dr. Saghafi's Opinion Regarding Mr. Pitrman's Standing and Walking Limitations in Her RFC Assessment

Mr. Pitrman's sub-claim asserts that the ALJ erred because her RFC did not include limitations suggested in the medical opinion from Dr. Saghafi, a consultative examiner, particularly regarding Mr. Pitrman's ability to sit and stand for 200 minutes. (ECF Doc. 12, PageID#1208-10). Mr. Pitrman contends that the ALJ correctly found that Dr. Saghafi's opinions regarding the Mr. Pitrman's lifting and carrying abilities was inconsistent with his cardiac history, but ignored Dr. Saghafi's opinions regarding Mr. Pitrman's ability to sit or stand by failing to explain why this limitation is unsupported by the record. (*Id.* at PageID#1209).

However, the Social Security regulations for assessing the persuasiveness of medical opinions only requires "that the ALJ 'explain' how the factors undergirding a finding of persuasive

24

were considered." *Hogan*, 2021 WL 4477786, at *4. Here, the ALJ articulated reasons for finding Dr. Saghafi's medical opinion to be unpersuasive. (Tr. 30). Specifically, the ALJ found that Dr. Saghafi's opinion was "somewhat supported" by Dr. Saghafi's "relatively unremarkable examination of the claimant" that yielded findings of full strength, normal range of motion, normal gait, and no respiratory distress with exertion. (*Id.*). However, the ALJ noted that Dr. Saghafi's opinion (including the lifting and carrying limitations) was inconsistent with the remaining record evidence. (*Id.*). The ALJ notes more specifically that Mr. Pitrman's "rather extensive cardiovascular history"—with evidence of coronary artery disease, status post percutaneous coronary angioplasty and coronary artery bypass graft, with an ejection fraction as low as 35% at times, and Mr. Pitrman's reportedly persistent chest pain and shortness of breath – confirmed greater exertional limitations than those proposed by Dr. Saghafi. (*Id.*). Because the ALJ found that Dr. Saghafi's opinion was unpersuasive and articulated her reasons for doing so, the ALJ was not required to take Dr. Saghafi's opinion into account when conducting the RFC assessment.

To the extent that Mr. Pitrman attempts to assert that the ALJ should have found greater limitations to Mr. Pitrman's mobility based on Dr. Saghafi's opinion, this argument is unavailing. As stated previously, an ALJ is *not* required to adopt the limitations of a medical opinion verbatim even if found persuasive. Here, the ALJ found that Dr. Saghafi's opinion was *not persuasive*. Thus, as stated above, the ALJ did not need to adopt the limitations that Mr. Pitrman proposes.

Finally, reading the decision as a whole, the ALJ demonstrates how she reached her conclusion regarding Mr. Pitrman's RFC for standing and walking. Over the span of eight pages, the ALJ laid out the evidence in the record, including Mr. Pitrman's ability to stand or walk. (Tr. 21-31). For example, in April 2018, Mr. Pitrman told his provider after his heart treatment that he was able to walk much more and that he did not get out of breath anymore. (Tr. 22, 397). The ALJ

noted that Mr. Pitrman continued to report shortness of breath with climbing stairs (Tr. 22-24), but Mr. Pitrman also retained appropriate gait and was instructed to increase ambulatory activity as tolerated (Tr. 24, 550-53, 906). Yet, in December 2019, Mr. Pitrman reported improved functional status since surgery; specifically, he denied shortness of breath, chest pain, or fatigue from exertion. (Tr. 24-25, 935). The ALJ discussed stress testing that induced angina-like discomfort and Mr. Pitrman's statements that he had pain while taking out the garbage, but she also pointed to contradictory evidence, *i.e.,* Mr. Pitrman was observed at an inpatient visit being able to ambulate on flat surfaces and up three flights of stairs without difficulty or chest pain. (Tr. 25, 970, 1031, 1046). Finally, the ALJ even cited Dr. Saghafi's clinical findings that Mr. Pitrman did not have mobility limitations. (Tr. 26, 1020-21). Mr. Pitrman, however, fails to address any of this evidence cited by the ALJ in her discussion.

Mr. Pitrman has failed to demonstrate how the ALJ erred in her persuasiveness analysis or address any of the evidence cited by the ALJ in support of her RFC assessment. For these reasons, I find that his sub-claim lacks merit. An ALJ has the "difficult task" of "weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). Where the ALJ presents substantial evidence in support of her conclusion, as the ALJ did here, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of evidence, supports the claimant's position." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, I recommend that the Court reject Mr. Pitrman's first assignment of error.

### G.  *Mr. Pitrman's Second Assignment of Error*

Mr. Pitrman next asserts that the ALJ's decision is not supported by substantial evidence because the ALJ misstated the record regarding Mr. Pitrman's daily activities and then used those activities to find that Mr. Pitrman's allegations of disability were not credible. (ECF Doc. 12,

PageID#1210). He asserts that the ALJ selectively parsed the record (*i.e.*, "cherry picking") in reaching the conclusion that his daily activites suggested that he was not as restricted as he claimed. (*Id.*). First, Mr. Pitrman argues that it is "difficult to see" how the ALJ's cited daily activities supports her light-level RFC because those activities are sedentary. (*See id.* at 1210-11). Next, he asserts that the ALJ misrepresented his abilities in walking and biking, which he contends describes a sedentary daily regimen and provides no basis to discount his allegations or their credibility. (*Id.*).

Mr. Pitrman's second assignment of error is not well-taken because the ALJ provided substantial evidence in support of the conclusion that Mr. Pitrman's symptoms were not as severe as he alleged. An ALJ must consider a claimant's description of his limitations, but she cannot rely solely on those complaints in formulating the residual functional capacity. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."); 20 C.F.R. §§ 404.1529(a); 416.929(a) (requiring "medical signs and laboratory findings" in support of a claimant's assertions in order to warrant a finding that she is disabled). Rather, an ALJ must analyze regulatory factors, including a claimant's own descriptions, objective medical evidence, daily activities, medications used, and any measures the claimant uses to relieve his complaints. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3P, 2017 WL 5180304, *9. The Commissioner's rules recognize that there will be conflicting evidence, but charge the ALJ with assessing the record as a whole before reaching the residual functional capacity. *See* 20 C.F.R. §§ 404.1529(c)(4); 416.929(c)(4) (The agency will "consider whether there any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence.").

The ALJ discussed Mr. Pitrman's complaints in support of her conclusion. The ALJ pointed out that the medical record contained evidence of chronic ischemic heart disease, coronary artery disease, lumbar degenerative disc disease, and obesity that would cause difficulty with some activities, including lifting and carrying and prolonged standing and walking. (Tr. 27). However, the ALJ concluded that Mr. Pitrman's hearing testimony regarding his limitations was inconsistent with the objective evidence, "as [his] examinations have revealed no acute distress, normal cardiovascular findings, clear lungs, and otherwise normal extremities." (*Id.*). This included findings of full strength, normal range of motion, and normal pulses, reflexes, sensation, and gait. (*Id.*). And in discussing Mr. Pitrman's subjective complaints, the ALJ explicitly considered other factors outlined in 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p. For example, the ALJ discussed Mr. Pitrman's course of treatment. Specifically, the ALJ outlined that Mr. Pitrman remained symptomatic after angioplasty and coronary artery bypass, and that he said he had some improvement with medication after those treatments. (Tr. 29, 386-420, 294-342, 1150).

Mr. Pitrman takes issue mainly with the ALJ's discussion of his daily activities and the ALJ's determination that his daily activities confirmed that he was not as physically limited as he alleged. Yet, Mr. Pitrman fails to acknowledge that Social Security Regulations list daily activities as one of the factors that an ALJ may consider when evaluating subjective symptom complaints. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."); *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

In determining that Mr. Pitrman's daily activities "while perhaps somewhat restricted, nevertheless confirm he is not as physically limited as alleged" (Tr. 28), the ALJ pointed to the

fact that Mr. Pitrman testified that he went for walks, rode his bike, and did basic household care activities. (Tr. 28, 60-61, 66). The ALJ also relied on Mr. Pitrman's medical reports from his consultative examination with Dr. Saghafi, where Mr. Pitrman reported that he "organizes his tools which gives him something to do which explains the work dirt under all of his fingernails." (Tr. 28, 1019). Mr. Pitrman also told Dr. Saghafi he could work on his lawn mower, wash laundry and dishes, and carry a five-gallon pail approximately fifteen feet. (Tr. 28, 1019, 1021). Notably, it appears even Dr. Saghafi questioned Mr. Pitrman's alleged limitations. Dr. Saghafi wrote in the "Impression" section of his consultative examination medical opinion that Mr. Pitrman "suffers from exertional dyspnea, states that he is incapable of performing anything but the mildest amount of physical labor, ***however***, does work his tools in his garage to repair his lawn mower and also keep himself occupied." (Tr. 1021) (emphasis added).

Although Mr. Pitrman states that his daily activities lend itself to a conclusion that he has sedentary limitations, the evidence cited by the ALJ (as discussed above) also point towards a conclusion that his daily activities were inconsistent with his claimed limitations of lifting no more than five pounds and walking no more than ten minutes at a time. (Tr. 65-66). The evidence regarding Mr. Pitrman's daily activities was "plausibly contradictory," and the ALJ was justified in using this evidence in assessing Mr. Pitrman's alleged symptoms. *See Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 452 (6th Cir. 2017) ("But as we have previously noted, evidence regarding [the claimant's] daily activities was plausibly contradictory. The ALJ's adverse inference was therefore justified under prevailing Sixth Circuit law."); *Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195 (6th Cir. 2020) (finding that claimant's alleged "accommodations" in her daily activities did not demonstrate that the ALJ mischaracterized her activities or why her participation

in those activities, even with those accommodations, required less ability than one would normally expect).

Finally, while Mr. Pitrman contends that the ALJ selectively parsed the facts regarding his daily activities to reach the conclusion that Mr. Pitrman seemed more capable than he really was, he misstates some of the evidence he cites in support of this argument. For example, Mr. Pitrman argued that the ALJ found that he could "perform work on his … feet for six hours in a work shift, as the ALJ found [him] capable of doing.' (ECF Doc. 12, PageID#1210-11). Yet, a review of the decision reflects the ALJ did *not* reach this conclusion. Rather, the ALJ specifically found that the "activities of daily living detract[ed] from his allegations of totally debilitating impairment." (Tr. 28). Significantly, Mr. Pitrman fails to offer any explanation regarding why any reasonable person could reach the conclusion that his reported daily activities plausibly contradicted his alleged limitation of lifting only a few pounds and walking no more than a few minutes. (Tr. 28, 1019, 1021). Nor does he dispute—or even discuss in his merits brief—the ALJ's discussion of his course of treatment in her assessment of his alleged symptoms. (*See generally* ECF Doc. 12, PageID#1210-11).

In conclusion, the ALJ properly considered Mr. Pitrman's ability to perform day-to-day activities as one of the factors (along with others) in the ALJ's assessment of his subjective complaints. *See Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013). Weighing inconsistency unfavorably to Mr. Pitrman's position is not cherry picking. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[T]he same process can be described more neutrally as weighing the evidence."). Accordingly, I find that Mr. Pitrman's second of assignment of error is without merit.

### H.  *Mr. Pitrman's Third Assignment of Error*

Mr. Pitrman's final assignment of error is that the ALJ erred in evaluating Mr. Pitrman's compliance with recommended medical treatment without following "the dictates" of SSR 18-3p. (ECF Doc. 12, PageID#1211). Specifically, Mr. Pitrman contends that the ALJ noted Mr. Pitrman's noncompliance with recommended medical treatment as a further basis for the ALJ's decision, but failed to consider the factors articulated under SSR 18-3p in her evaluation. (*See id.* at 1211-12). He asserts that the predicate for examining a person's compliance or non-compliance is absent from the ALJ's decision. (*Id.* at 1212). Mr. Pitrman contends that the ALJ ignored SSR 18-3p and used his noncompliance "as a sort of 'back door' support for her decision" by "effectively implying" that he is a "bad person for not following his doctors' recommendations." (*Id.*). In doing so, Mr. Pitrman asserts that the ALJ engaged in an irrelevant inquiry that also failed to consider whether his noncompliance might have been justified by one or more of the factors cited in SSR 18-3p. (*Id.*). Thus, he argues this is an error requiring remand. (*Id.*).

Mr. Pitrman's assertion is not well-taken. He contends, without support, that it is unfair for the ALJ to cite his noncompliance with his providers' treatment recommendations because the ALJ was required to ask him why he did not follow his doctor's recommendations. But this assertion is wholly unsupported by the Social Security Regulations and relevant case law. Indeed, Mr. Pitrman concedes that SSR 18-3p only applies if the claimant is already found disabled. (ECF Doc. 12, PageID#1212); SSR 18-3p at *2 ("We only perform the failure to follow prescribed treatment analysis … ***after we find that an individual is entitled to disability***…") (emphasis added); 20 C.F.R. §§ 404.1530, 416.930. Here, the ALJ determined that Mr. Pitrman was ***not*** disabled. Thus, Mr. Pitrman's reliance on SSR 18-3p is unavailing because this rule is wholly inapplicable here.  *See Ranellucci v. Astrue*, No. 3:11-cv-00640, 2012 WL 4484922, at *10 (M.D. Tenn. Sept. 27, 2012) (addressing SSR 18-3p's predecessor).

Next, a claimant's failure to follow recommended treatment is relevant to an ALJ's assessment of the severity of a claimant's alleged impairments, particularly when considering a claimant's subjective complaints. For example, 20 C.F.R. § 416.929(c)(3) indicates that an ALJ may consider the types of medication and treatment sought by the claimant. 20 C.F.R. § 416.929(c)(3). Further, SSR 16-3p dictates that when the ALJ considers subjective complaints, she may consider whether the frequency or extent of a claimant's treatments are comparable to the claimant's subjective complaints. SSR 16-3p, 2017 WL 5180304, *9 (The Commissioner may find alleged limitations inconsistent "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints."). Although Mr. Pitman asserts that the ALJ improperly pointed out that he had "not undergone cardiac rehabilitation as ordered, and he continues to smoke," he omits the ALJ's discussion of his non-compliance to show that his conditions, while severe, "are manageable with the relatively conservative current scope of medical treatment." (Tr. 29).

Finally, as the Commissioner points out, other district courts within the Sixth Circuit and the Sixth Circuit itself have affirmed the Commissioner's decision where the ALJ cited noncompliance with cardiac rehabilitation and smoking. *See Amer v. Comm'r of Soc. Sec.*, No. 1:13-cv-282, 2014 WL 1338115, at *13 (S.D. Ohio April 2, 2014) ("Regarding noncompliance, the ALJ noted that plaintiff had stopped attending physical therapy for her back, stopped going to cardiac rehabilitation, and failed to monitor her blood sugar as directed,"); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (smoking); *Nettelton v. Comm'r of Soc. Sec.*, No. 17-1443, 2018 WL 862533, at *2 (6th Cir. Feb. 14, 2018) ("Lastly, [the plaintiff] was not completely compliant with his medical treatment, as he was told to quit smoking but had not done so. The ALJ appropriately considered all these factors to arrive at a credibility determination,

discounting the severity of [the plaintiff's] alleged symptoms."). Thus, noncompliance is a permissible factor that the ALJ may consider, along with other evidence in the record, when assessing a claimant's subjective complaints and formulating a plaintiff's residual functional capacity. Accordingly, I recommend that the Court reject Mr. Pitrman's final assignment of error and affirm the Commissioner's decision.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Mr. Pitrman's assignments of error and AFFIRM the ALJ's decision.

Dated: April 10, 2023

_s/ Jennifer Dowdell Armstrong_
Jennifer Dowdell Armstrong
United States Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

_Id._ (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or

waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).